NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID W. SAYRES, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | CIVIL NO. 05-4533 |
| v. | |
| JO ANNE B. BARNHART, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **OPINION** |
| Defendant. | |

APPEARANCES:

Robert Anthony Petruzzelli, Esq.
Lori Winkler Kesselman, Esq.
JACOBS SCHWALBE & PETRUZZELLI, P.C.
Woodcrest Pavilion
Ten Melrose Avenue
Suite 340
Cherry Hill, NJ 08003
     Attorneys for Plaintiff

Christopher J. Christie
United States Attorney
     By:  Sandra Grossfeld, Esq.
          Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Room 3904
New York, NY 10278-0004
     Attorney for Defendant

**SIMANDLE**, District Judge:

        This matter comes before the Court pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g), to review the final decision of the Commissioner of the

Social Security Administration ("SSA"), denying the application of the plaintiff, David Sayres ("Plaintiff"), for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  This Court must decide whether the ALJ properly determined that Plaintiff is capable of performing work in the national economy and is, therefore, not disabled.  For the reasons explained below, the Court will affirm that decision.

I.    **BACKGROUND**

   A.   **Procedural History**

   Plaintiff filed an initial application for Disability Insurance Benefits on October 16, 2002 (R. at 55-57), alleging a disability onset date of July 24, 2001 (R. at 58).  Plaintiff claimed that he was completely disabled due to headaches, neck pain, numbness in both hands, back pain, an abdominal hernia, right hip and leg pain, and numbness in his feet, caused by a motor vehicle accident.  (R. at 65.)  SSA denied Plaintiff's application initially (R. at 42-44) and upon reconsideration (R. at 49-50).  On July 16, 2003, Plaintiff requested a hearing (R. at 52).  On August 20, 2004, the SSA's Office of Hearing and Appeals held a hearing at which Plaintiff appeared with counsel. (R. at 514-46.)  The Administrative Law Judge ("ALJ") found that Plaintiff was not disabled within the meaning of the Social Security Act (R. at 18) and, therefore, denied the requested benefits (R. at 17- 24).

2

**B.   Evidence in the Record**

1.   Plaintiff's Testimony

Plaintiff was represented by an attorney at the hearing and testified under oath.  Initially, the ALJ questioned Plaintiff about some of his unusual behavior and appearance at the hearing. Upon questioning by the ALJ, Plaintiff testified that both his wrists were wrapped because that helped alleviate the sharp pains from his fingertips through his arms caused by carpal tunnel syndrome.  (R. at 519.)  Plaintiff testified that his family doctor had recommended the wrapping about six months earlier. (Id.)  The ALJ also questioned Plaintiff about his gait. Plaintiff explained that he walks slowly and with a limp because "this right leg is real bruised real bad from the wreck," four years earlier, "and it's burning like it's on fire in there." (R. at 520.)  The ALJ noted that Plaintiff was sighing throughout the hearing, which Plaintiff explained was because he was in pain while sitting there.  (Id.)  Plaintiff testified that he was like this "[a]ll the time."  (R. at 521.)

Plaintiff testified that he drives occasionally to appointments with his doctors or his lawyer (R. at 533) because he lives with only his wife, who does not drive, and his twelve year-old son, (R. at 521), but that sitting for even twenty minutes causes him pain (R. at 528).  However, Plaintiff also testified that he drove his manual transmission Ford 250 pick-up

3

truck to the hearing, without stopping, for one hour and twenty minutes. (R. at 527-28, 533-34.)

Plaintiff testified that he does not do much on a typical day, that he generally lays down and watches television or his son playing video games. (R. at 530-31.)  Plaintiff testified that he is unable to do any chores around the house since the accident (R. at 531-32) because he has trouble lifting and grabbing things (R. at 535).

Plaintiff also testified that he was thrown out of high school when he was in the tenth grade. (R. at 534.)  Prior to that, he was in special education classes and, he claims, is functionally illiterate, although he was able to learn the meaning of traffic signs. (R. at 535).

2.   Medical Records

Plaintiff submitted copious medical records dating from June 1991 to December 2003. (R. at 107-510.)   Many of the early records relate to Plaintiff's back strains which were caused by a 1990 collision he suffered while working as a truck driver (see, e.g., R. at 108) and a 1991 altercation with a police officer (see, e.g., R. at 109).  He was treated with physical therapy, pain killers, and a back brace for approximately one year by Dr. James Wong.  (R. at 110-11.)  Because Plaintiff continued to complain of back pain and right leg numbness, Dr. Wong referred him to a neurosurgeon.

4

According to Plaintiff, however, his "most significant complaints stem from a serious motor vehicle accident on May 8, 2000" (Pl.'s Br. at 3), when the tractor trailer he was driving went off the road and flipped over (R. at 243).  Plaintiff was hospitalized for four days.  (Id.)  When Plaintiff was brought to the hospital, he had some cuts on his legs, soreness in his back and abdomen, and a closed head injury.  (R. at 217.)  On discharge, the hospital noted that he had a concussion when he came in and was admitted to determine whether he had a back injury.  During his time in the hospital, Plaintiff had x-rays of his cervical, thoracic and lumbar spines as well as his left leg and chest, which were normal except for some degeneration in his cervical spine.  (R. at 243).  A CT scan of his abdomen was also normal.  (Id.)  Plaintiff was being treated with Oxycontin and by the date of discharge he was "doing much better with his pain control."  (Id.)  He was told merely to follow up with his primary care doctor in a week.  (Id.)

After the accident, Plaintiff continued under the care of Dr. Scott Williams, his orthopedist; came under the care of Dr. Vipin Gupta, a neurologist; and underwent physical therapy for cervical and lumbar sprain or strain.  (R. at 361).

An MRI on May 31, 2000 showed a cervical disc herniation at C4-C5 and a small central disc protrusion at C3-C4.  (R. at 351.)

In June, he was complaining that he had severe headaches every day since the accident.  (R. at 353.)  Nerve conduction and EMG studies conducted by Dr. Gupta were normal, showing no evidence of cervical radiculopathy or other focal neuropathy.  (R. at 358-40).

On his last visit to physical therapy in November 2000, Plaintiff was evaluated as improved in his functional status, and was noted to have no difficulty lifting or carrying up to ten pounds, or negotiating steps.  (R. at 361.)  In September, he had been evaluated as having no difficulty performing household tasks and dressing himself.  On both visits, the physical therapist evaluated Plaintiff as having minimal difficulty kneeling and driving (R. at 361, 367) and in September and October he had maximum difficulty participating in sports (R. at 364, 367).  The physical therapist also noted that Plaintiff was having minimal back spasms in September and that he reported a pain level of three (on a scale of one to ten) when at rest and of eight with activity.  (R. at 368.)  He was also reported to have a sitting, standing, and walking tolerance of ninety minutes each (R. at 368) in September, although that ability regressed when he took long breaks from physical therapy, as noted in October (R. at 365).

In September 2000, Dr. Gupta diagnosed Plaintiff with post-traumatic stress disorder, causing him headaches.  (R. at 389.)

Dr. Gupta also noted some neck stiffness and back tenderness, but found Plaintiff's gait to be normal.  (<u>Id.</u>)

Dr. Williams diagnosed Plaintiff as having cervical and lumbar strain and recommended continued physical therapy.  (R. at 405, 406.)  Dr. Williams's associate, Dr. Packman, examined Plaintiff on November 13, 2000 and was unable to detect the source of several of his complaints.[1]  Dr. Packman advised him that he may be approaching "maximum medical improvement" as six months had passed since his accident and Plaintiff was "still having these very subjective complaints."  (R. at 408.)  On November 27, 2000, Dr. Williams examined Plaintiff and found that he had "no positive neurologic deficit" and that although he complained of pain in his leg, neck, back, and all over, as well as reduced reflexes, Plaintiff had no swelling, had palpable pulse and sensation, his reflexes were normal and his straight

---

[1] It may be relevant, with regard to Plaintiff's headaches, nausea, blurred vision and other symptoms that were difficult for doctors to document, that Plaintiff typically drinks more than a six-pack of beer per day.  (R. at 461, 480.)  In August 2002, Plaintiff informed Dr. Dirk Skinner, a neurologist, of "daily alcohol intake, including beer, wine, and liquor," of unestimated amounts.  (R. at 475.)  In March 2003, Plaintiff told Dr. Cervantes that he resorted to drinking alcohol because he was not receiving sufficient pain medication and that he typically drank a half a case of beer and a pint of cheap liquor every day.  (R. at 503.)  Along with his daily alcohol intake, Plaintiff was taking three Percocets per day, and five or six Tylenols or Advils per day. (R. at 480).  Although Plaintiff's alcohol use was not relevant to the ALJ's findings below, the Court notes that the regulations create additional hurdles for individuals suffering from alcoholism who are seeking disability benefits.  20 C.F.R. § 404.1535.

leg raising produced some back pain, but not leg pain.  (R. at 405.)

On December 11, 2000, Dr. Williams examined Plaintiff and found that he could rotate his cervical spine 40 degrees to the right and to the left, that his reflexes were normal, and there was no evidence of muscle weakness in Plaintiff's grasp.  (R. at 403).  Dr. Williams reported normal neurological findings in Plaintiff's legs.  Although Dr. Williams noted that Plaintiff was still complaining of some tenderness and pain, he found that "I think he is capable of returning to work on January 2, 2001," without restriction (R. at 404), noting that Plaintiff needed the time between the December 11 and the New Year only "to increase his strength and his ability to drive a truck."  (R. at 403.)

Then, in August 2001 Plaintiff came under the care of Dr. Luis Cervantes, a neurosurgeon, who noted that Plaintiff had stopped working in June of 2001 because he had severe cervical pain and was afraid that he would be involved in another accident.  (R. at 469-73, 502.)  Dr. Cervantes opined that Plaintiff might require removal of the cervical disc at C4-5 (R. at 473) and the record indicates that Plaintiff had that surgery in September 2001 (R. at 476, 502).  This appeared to improve Plaintiff's cervical pain, initially.  (R. at 502.)

After the surgery, Plaintiff returned to physical therapy, which he had stopped because of a small bowel obstruction related

8

to a previous hernia surgery.  (Id.)  When Dr. Cervantes saw Plaintiff again several months later, "he complained of back pain with paresthesias on the lateral aspect of his right thigh, a symptom that he complained of in the beginning as well as some interscapular pain."  (Id.)

Dr. Cervantes summarized many of his findings in a June 2002 letter to Plaintiff's former counsel.  (R. at 469-70.)  Dr. Cervantes noted:

> When I examined him, he had good strength and good range of motion of his cervical spine and good strength of his upper and lower extremities, complaining every time I asked him to perform any kind of motion.  [He had] decreased sensation in the anterior aspect of his right thigh, and no pain on straight leg raising.  Gait and stance are normal and he has fairly good range of motion in his lumbar spine.  I asked Mr. Sayres to obtain an MRI of his cervical spine which was performed on April 4, 2002, that shows narrowing of the foramina bilaterally at C4-5 and C5-6 without any herniated disk at those levels.  He had a small herniated disk at C3-4 which was present before and that is clinically unsignificant.
> [. . . ]
> To this point, I have not told Mr. Sayres that he needs to have treatment of his lumbar spine problem.  I did ask Mr. Sayres to get a cervical myelogram and post-myelogram CAT scan to find out where his continuous complaints are coming from.

(Id.)  The record shows that Plaintiff had this additional testing and that it was normal.  (R. at 500.)

9

In addition to the findings noted above, Plaintiff's medical records are peppered with observations of his exaggerated or unexplained expressions of pain.  Dr. Skinner, a neurologist who apparently examined Plaintiff in August 2002, noted that during the examination "[a]ny type of movement resulted in complaints of distress," and that Plaintiff had "grossly exaggerated tenderness to minimal tapping of the bilateral posterior neck, mid-back and low back."  (R. at 478.)  Dr. Skinner concluded that Plaintiff's subjective complaints had no known objective basis:

> I cannot explain his lack of improvement given essentially normal test results and examinations indicating only primarily subjective abnormalities, particularly two years following his accident.  His objective neurological examination is normal, and there is gross overlay on my examination and others' (in particular Dr. Gupta's and Dr. Fiedler's examinations). . . .  If his history is correct, his other subjective symptoms began following his 05/08/00 work-related motor vehicle accident, but there is no objective basis for which to claim any neurologic disability or the need for any additional neurological testing or treatment at this time.

(R. at 479.)

Similarly, in October 2002, Dr. Khona, an internist, performed a consultative examination for SSA of Plaintiff and noted that he was in "questionable distress."  (R. at 481.)  "He moaned and groaned throughout the evaluation.  He was able to get off the examining table with some difficulty, but without any assistance, and he walked without any assistive device . . . .

10

His stance appeared normal . . . . He was able to rise frm the chair, but claimant was very dramatic and moaned and groaned throughout." (Id.)  As the ALJ noted, at this examination Plaintiff refused to cooperate with the muscoskeletal or grip strength testing that his treating doctors repeatedly performed, claiming that these tests caused him too much pain.  (R. at 482-83.)

Then in December 2002, a second medical consultant for SSA performed a physical residual functional capacity assessment of Plaintiff and completed a form describing the findings. (R. at 492-98.)  That consultant found that Plaintiff could occasionally lift and/or carry up to fifty pounds, could frequently lift and/or carry up to twenty-five pounds, could stand (with normal breaks) for a total of about six hours in an eight-hour workday, could sit (with normal breaks) for a total of about six hours in an eight-hour workday, and had no limitations on his ability to push or pull.  (R. at 493.)  The consultant also noted that during his examination of Plaintiff, he "appeared in questionable distress," and although he "moaned and groaned" throughout the exam, he was able to get on and off the exam table "with little difficulty and no assistance" and that the results of the exam were "limited" due to Plaintiff's "lack of cooperation" with the medical consultant.  (Id.)  The consultant also found that Plaintiff had no "postural limitations," that is, no limitation

on his ability to climb ramps or stairs, to balance, to stoop, to kneel, to crouch, or to crawl.  (R. at 494).  The exam also found no limitations in Plaintiff's ability to use his hands for reaching and grabbing, and no other limitations.  (R. at 494-97.) According to the medical consultant, the record evidence did not support a finding that Plaintiff's impairments were severe enough to be disabling and Plaintiff's allegations were only partially credible.  (R. at 497.)  It should be noted that the ALJ assigned little weight to these findings because they came before it was evident that Plaintiff required additional surgery.  (R. at 22).

Specifically, in March 2003, Dr. Cervantes examined Plaintiff and noted that he had "decreased range of motion of his cervical spine with increased pain on extension, that radiates to both upper extremities," as well as "decreased range of motion of his lumbosacral spine." (R. at 504).  Dr. Cervantes determined that an April 2002 MRI showed that Plaintiff had developed "cervical arthrosis at C4-C5 with an angulation and gibbus deformity at that level with some anterior spinal cord compression." (Id.). Dr. Cervantes found:

> There are a number of things wrong with Mr.
> Sayres.  First, he has a failed anterior
> cervical discectomy and arthrodesis, which is
> partly causing his cervical pain and a lot of
> the symptoms of tiredness and general
> malaise, because of anterior cervical cord
> compression.  Secondly, he has bilateral
> carpal tunnel syndrome, clinically, which has

> developed recently and that bears no
> relationship with a reasonable degree of
> medical probability to his injury three years
> ago.  He also has chronic lumbosacral
> sprain/strain and has right femoral cutaneous
> nerve compression injury.
>
> Mr. Sayres needs to have an anterior cervical
> re-operation, by means of a C4 and C5
> corpectomy, with new grafting and anterior
> instrumentation.  If this is not done, he
> will have the risk of developing myelopathy,
> which at his young age would be quite
> incapacitating and irreversible.

(R. at 504.)  Plaintiff underwent the additional surgery in May
2003.  (R. at 499-500.)  In Dr. Cervantes's opinion this surgery
"resolved" Plaintiff's cervical spondylosis, but Plaintiff would
continue to suffer from lumbosacral strain/sprain.  (R. at 501.)

On November 24, 2003, Dr. Cervantes determined that
Plaintiff could return to work with some restrictions, as
documented in a letter to Plaintiff's former counsel on December
11, 2003.  (R. at 500-01.)  In that letter, Dr. Cervantes
essentially assessed Plaintiff's residual functional capacity:

> On November 24, 2003 [Plaintiff] was told
> that he was able to return to work in a light
> duty capacity and was allowed to alternate
> sitting and standing every ninety minutes
> with ten minute rests.  He is not able to
> drive any heavy equipment and he is able to
> drive light vehicles.  He is not able to lift
> anything heavier than 20 lbs., climb ladders,
> work on rooftops, crawl or squat.

(R. at 500).  The ALJ relied on parts of this letter in making
his own determination of Plaintiff's residual functional
capacity, as explained below.

13

3.   <u>Testimony of Vocational Expert Dr. Slaven</u>

At the hearing, the ALJ utilized the testimony of a
vocational expert, William Slaven, to determine Plaintiff's
ability to work.  (R. at 537-45.)  To elicit the vocational
expert's opinion, the ALJ referred to Dr. Cervantes's December
11, 2003 letter, which states that Plaintiff could return to work
in a light duty capacity, so long as he was allowed to alternate
sitting and standing every ninety minutes and to take ten-minute
rest breaks.  Dr. Slaven testified that "most employers" would
not permit an employee to take breaks every ninety minutes, but
would permit breaks every two hours.  (R. at 540-41.)  The ALJ
then asked Dr. Slaven whether unskilled occupations existed for
individuals who need to alternate sitting and standing every
ninety minutes but need to take ten-minute breaks every two
hours.  (R. at 541.)  Dr. Slaven testified that there were jobs
available for someone with such a residual functional capacity:
for example, locker room attendant, marking clerk, surveillance
system monitor, and telephone information clerk.  (R. at 542-43.)
Dr. Slaven indicated that these jobs would not be available to
someone who needed to take breaks every ninety minutes.  (R. at
543.)  Dr. Slaven also testified that if Plaintiff was believed –
that is, if it was true that he could not lift a coffee cup or a
gallon of milk without experiencing pain, that he could only walk
fifty feet at a time without pain, that he could only sit for

14

twenty minutes at a time, and that he was severely restricted in his ability to bend or walk up stairs – there would be no work that he was able to perform.  (Id.)  However, Dr. Slaven testified, if Plaintiff's carpal tunnel syndrome were as severe as he said, he would still be able to work as a surveillance system monitor.  (R. at 545.)

## II.  DISCUSSION

### A.   Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a complainant's application for Disability Insurance Benefits.  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the

15

Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his reasons for rejecting or discrediting competent evidence." Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has held that an "ALJ must review all pertinent medical evidence and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  Similarly, an ALJ must also consider and weigh all of the non-medical evidence before him.  Id. (citing Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Cotter v. Harris, 642 F.2d 700, 707 (3d Cir. 1981).

The Third Circuit has held that access to the Commissioner's reasoning is essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is

> supported by substantial evidence approaches
> an abdication of the court's duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  A district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." Williams, 970 F.2d at 1182.  However, an ALJ need not explicitly discuss every piece of relevant evidence in his decision.  See Fargnoli v. Massanari, 247 F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at his decision by application of the proper legal standards.  Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).

**B.   Standard for Disability Insurance Benefits**

The Social Security Act defines "disability" for purposes of an entitlement to a period of disability and disability insurance benefits as the inability to engage in any substantial gainful activity by reason of any medically determinable physical and/or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months.  See 42 U.S.C. §1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled only if his physical or mental impairments are of such

17

severity that he is not only unable to perform his past relevant work, but cannot, given his age, education, and work experience, engage in any other type of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  42 U.S.C. § 1382c(a)(3)(B)(emphasis added).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential analysis.  See 20 C.F.R. § 404.1520.  This five-step process is summarized as follows:

1.   If the claimant currently is engaged in substantial gainful employment, he will be found "not disabled."

2.   If the claimant does not suffer from a "severe impairment," he will be found "not disabled."

3.   If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found "disabled."

4.   If the claimant can still perform work he has done in the past ("past relevant work") despite the severe impairment, he will be found "not disabled."

5.   Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education, and past work experience to determine whether or not he is capable of performing other work which exists in the national economy.  If he is incapable, he will be found "disabled."  If he is capable, he will be found "not disabled."

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is
therefore dependent upon a finding that the claimant is incapable
of performing work in the national economy.

This five-step process involves a shifting burden of proof.
See Wallace v. Secretary of Health & Human Servs., 722 F.2d 1150,
1153 (3d Cir. 1983).  In the first four steps of the analysis,
the burden is on the claimant to prove every element of his claim
by a preponderance of the evidence.  See id.  In the final step,
the Commissioner bears the burden of proving that work is
available for the plaintiff: "Once a claimant has proved that he
is unable to perform his former job, the burden shifts to the
Commissioner to prove that there is some other kind of
substantial gainful employment he is able to perform."  Kangas v.
Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  See Olsen v. Schweiker,
703 F.2d 751, 753 (3d Cir. 1983).

   **C.   Analysis**

      1. Parties' Arguments

Plaintiff argues that (1) the ALJ failed to properly
determine Plaintiff's residual functional capacity and (2) the
Agency failed to adhere to Social Security rulings 83-12 and 96-
9p when denying him benefits.  The Commissioner argues, first,
that the ALJ properly determined Plaintiff's residual functional
capacity when the ALJ accepted part of Dr. Cervantes's
assessment, but rejected the recommended rest break interval

because it was based solely on Plaintiff's subjective complaints and was not supported by the medical record.  Second, the Commissioner argues that the ALJ appropriately followed Social Security rulings 83-12 and 96-9p.  The Commissioner notes that 83-12 only recommends that a vocational expert be consulted when a person needs to alternate sitting and standing, and that the ALJ did that in this case.  The Commissioner also notes that 96-9p indicates that the inability to do prolonged sitting erodes the occupational base but does not, as Plaintiff contends, indicate that no jobs are available that permit alternate sitting and standing.

> 2.  <u>Residual Functional Capacity</u>

Residual functional capacity ("RFC") is the most a claimant can do despite that person's limitations.  20 C.F.R. § 404.1545. The ALJ assesses a claimant's residual functional capacity based on all the relevant evidence in the case record.  <u>Id.</u>, 20 C.F.R. § 404.1546(c).

> If [the] impairment(s) does not meet or equal
> a listed impairment, [the ALJ must] assess
> and make a finding about . . . residual
> functional capacity based on all the relevant
> medical and other evidence in your case
> record . . . [The ALJ] uses [the] residual
> functional capacity assessment at the fourth
> step of the sequential evaluation process to
> determine if [the claimant] can do . . . past
> relevant work . . . and at the fifth step of
> the sequential evaluation process (if the
> evaluation proceeds to this step) to
> determine if [the claimant] can adjust to
> other work . . . .

20 C.F.R. § 404.1520(e).

In this case, the ALJ determined that Plaintiff's impairments did not meet or exceed listed impairments and that Plaintiff was unable to do his past work (R. at 23), so the ALJ was required to assess Plaintiff's RFC in order to determine whether there is other work available in the national economy that Plaintiff can perform.  Based on his assessment of Plaintiff's credibility and the medical evidence submitted, the ALJ found that

> the claimant has the capacity to lift or carry 10 pounds frequently or 20 pounds occasionally in an 8 hour workday, to stand, walk, or sit about 6 hours in an 8 hour work day.  The claimant must be allowed to sit or stand at his option, must be permitted to take a ten minute rest break after working two hours, and must not be required to climb ladders, work on rooftops, crawl, or squat.  Therefore, he has the residual functional capacity to perform a restricted range of sedentary and light work activity as defined in 20 CFR 404.1567(a),(b).

(R. at 22.)  The Vocational Expert testified that there were jobs available in the national and local economy to individuals with this RFC as well as claimant's age, education and work experience: locker room attendant, marking clerk, surveillance system monitor, and telephone information clerk.  (R. at 542.)  Thus, the ALJ determined that Plaintiff was not disabled.  (R. at 23.)

21

Essentially, Plaintiff's only argument on this point is that the ALJ erred by finding that Plaintiff could function with rest breaks every two hours instead of every ninety minutes, as Dr. Cervantes indicated.  This Court finds that the ALJ determined Plaintiff's residual functional capacity in accordance with the regulations.  (See R. at 22) (ALJ's explanation of RFC findings).  The ALJ was entitled to credit the portion of Plaintiff's treating physician's recommendation that was supported by objective medical evidence and to reject the portion -- suggesting breaks every 90 minutes instead of every 120 -- that was based merely on the physician's opinion arising from Plaintiff's subjective complaints.  See 20 C.F.R. §§ 404.1527(d)(2)(treating physician's opinion that is not supported by objective evidence is not controlling); 20 C.F.R. § 404.1527(d)(3) (treating physician's explanation of conclusions and provision of objective findings are factors in determining what weight SSA will give physician's conclusions); 20 C.F.R. § 416.927(d)(3) (same).  The ALJ's ability to weigh all the evidence is especially important in a case, such as this, where the ALJ had well-documented reasons for finding the claimant to be not credible and no objective medical evidence supported the treating physician's recommendations.  (R. at 22.)

         3.   Conformity with Rulings 83-12 and 96-9p

22

_____Furthermore, the Court agrees that the ALJ conducted the hearing in conformity with Social Security rulings 83-12 and 96-9p.  Ruling 83-12 provides, in relevant part:

> In some disability claims, the medical facts
> lead to an assessment of RFC which is
> compatible with the performance of either
> sedentary or light work except that the
> person must alternate periods of sitting and
> standing. The individual may be able to sit
> for a time, but must then get up and stand or
> walk for awhile before returning to sitting.
> Such an individual is not functionally
> capable of doing either the prolonged sitting
> contemplated in the definition of sedentary
> work (and for the relatively few light jobs
> which are performed primarily in a seated
> position) or the prolonged standing or
> walking contemplated for most light work.
> (Persons who can adjust to any need to vary
> sitting and standing by doing so at breaks,
> lunch periods, etc., would still be able to
> perform a defined range of work.)
> There are some jobs in the national
> economy--typically professional and
> managerial ones--in which a person can sit or
> stand with a degree of choice. If an
> individual had such a job and is still
> capable of performing it, or is capable of
> transferring work skills to such jobs, he or
> she would not be found disabled. However,
> most jobs have ongoing work processes which
> demand that a worker be in a certain place or
> posture for at least a certain length of time
> to accomplish a certain task. Unskilled types
> of jobs are particularly structured so that a
> person cannot ordinarily sit or stand at
> will. In cases of unusual limitation of
> ability to sit or stand, a VS [(vocational
> specialist)] should be consulted to clarify
> the implications for the occupational base.

SSR 83-12, 1983 WL 31253, at *4.  Ruling 96-9p provides, in relevant part:

> An individual may need to alternate the
> required sitting of sedentary work by
> standing (and, possibly, walking)
> periodically. Where this need cannot be
> accommodated by scheduled breaks and a lunch
> period, the occupational base for a full
> range of unskilled sedentary work will be
> eroded. The extent of the erosion will depend
> on the facts in the case record, such as the
> frequency of the need to alternate sitting
> and standing and the length of time needed to
> stand. The RFC assessment must be specific as
> to the frequency of the individual's need to
> alternate sitting and standing. It may be
> especially useful in these situations to
> consult a vocational resource in order to
> determine whether the individual is able to
> make an adjustment to other work.

SSR 96-9p, 1996 WL 374185, at *7.

These rulings indicate only that (1) a person's need to alternate sitting and standing reduces the number of jobs that person can perform and (2) an ALJ should consult a vocational expert when faced with such a claimant to determine whether there are suitable jobs available for that claimant.  The ALJ consulted a vocational expert in this case, and the vocational expert testified that there were jobs available to Plaintiff, based on the ALJ's determination that Plaintiff's RFC included a need to alternate sitting and standing every ninety minutes with breaks every two hours.  The vocational expert did so in response to the ALJ's hypothetical question that incorporated all of Plaintiff's limitations.

Although the rulings note that there are a reduced number of jobs for such people and suggest that the ALJ consult an expert,

24

they do not suggest, as Plaintiff argues, that someone who needs
to alternate sitting and standing is presumptively disabled or
that the ALJ should reject the opinion of an expert who indicates
that multiple jobs are available for an individual with these
unusual limitations.  Ruling 96-9p anticipates that the need for
a sit/stand job must be carefully examined by the vocational
expert, taking into account the frequency of the individual's
need to alternate standing and sitting, and recognizing that "the
occupational base for a full range of unskilled sedentary work
will be eroded."  Ruling 96-9p, <u>supra</u>.  This provision would make
no sense if Plaintiff were correct that the RFC for a sit/stand
job for an unskilled worker results automatically in a finding of
disability.  Even a significant reduction in the occupational
base does not equate with an absence of any occupations that a
claimant may be able to perform.  The ALJ's reliance upon the
vocational expert's opinion about the existence of suitable
sit/stand jobs in the national and local economy was consistent
with record and the governing regulations.

**III. CONCLUSION**

The Court will uphold the Commissioner's decision to deny
Plaintiff Social Security benefits.  There is substantial
evidence to support the ALJ's determination that Plaintiff is not
disabled because he can engage in substantial gainful work in the

national economy, notwithstanding his impairments.  The

accompanying Order will be entered.


**November 20, 2006**                    **s/ Jerome B. Simandle**
Date                                     JEROME B. SIMANDLE
                                         U.S. District Court

26